Richard BROWN, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–0506–CR–321.

Court of Appeals of Indiana.

June 7, 2006.

Joel M. Schumm, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Richard Brown appeals his convictions and sentence for three counts of class D felony criminal confinement and his guilty verdicts for three counts of class D felony identity deception.[1] We affirm in part, reverse in part, and remand.

### Issues

Brown raises nine issues, which we reorder and restate as the following six:

I. Whether the trial court abused its discretion in denying his motion for mistrial;

II. Whether he waived his constitutional challenges;

III. Whether the criminal confinement statute, Indiana Code Section 35–42–3–3, is unconstitutionally vague as applied to him;

IV. Whether the identity deception statute, Indiana Code Section 35–43–5–3.5, is unconstitutionally vague as applied to him;

V. Whether the evidence is sufficient to support the guilty verdicts for identity deception; and

VI. Whether the trial court violated his statutory and constitutional due process rights by imposing a $400 jury fee.

### Facts and Procedural History

On July 28, 2004, Brown called the Greek Islands Restaurant from his home at 1731 Fletcher Avenue in Indianapolis and spoke to A.H., a twenty-five-year-old server at the restaurant. Brown told A.H. that he was from the "93.1 radio station." Tr. at 52. 93.1 Radio Now is an Indianapolis radio station owned by Emmis Communications. Brown explained that the radio station was having a contest and that A.H. could win a car by going to 1731 Fletcher Avenue and persuading the occupant to give him a t-shirt in exchange for A.H.'s clothes. Brown told A.H. that it sometimes helped to bring food to bribe the

---

1. We held oral argument in Indianapolis on April 25, 2006. We thank counsel for their presentations.

person, and that A.H. would have to take a lie detector test the following day to see whether he followed the contest instructions. A.H. believed that Brown was a radio disc jockey and that the contest was legitimate because Brown sounded "very fast, very excited" like a radio personality. *Id.* at 53.

A.H. left the restaurant with a sandwich and drove to the Fletcher Avenue address. A.H. knocked on the front door, and Brown answered. A.H. explained the contest and gave Brown the sandwich. Brown suggested that A.H. drive to the back of the house so that the neighbors would not see him undress. A.H. did so, and Brown let him in the house through the back door. A.H. went to an adjacent room and took off his waiter's uniform while Brown watched from approximately four feet away. Brown gave A.H. a torn t-shirt, and he wrapped it around his waist like a beach towel and left.

On July 29, 2004, at approximately 6:00 a.m., Brown called a Steak 'n Shake restaurant and spoke with J.M., a college freshman employed as a waiter. Brown told J.M. that he was from Radio Now and that the station was holding a "dare contest," in which the contestant could win a new car of his choosing. *Id.* at 88. The dare was to trade his clothing for a t-shirt with the person at 1731 Fletcher Avenue, who knew about the contest, within the next hour. Afterward, J.M. would talk about the experience on the radio. J.M. agreed to enter the contest and drove to 1731 Fletcher Avenue.

J.M. rang the front door bell. When Brown answered, J.M. asked him if he knew anything about the contest. Brown said that he did not, but that his wife had entered Radio Now contests. J.M. explained the contest. Brown agreed to help, invited J.M. in, and gave him a child-sized t-shirt. J.M. asked Brown if he could go into a restroom to change. Brown replied, "No, that's all right. I'll see you anyway. It's not like I get off on that sort of thing." *Id.* at 94. J.M. started to unbutton his shirt but stopped when he saw Brown staring at him. He asked Brown to turn around. Brown turned slightly, but J.M. could see his profile. He also noticed that Brown's hand was shaking.

The situation made J.M. nervous. He asked Brown where his wife was. Brown told J.M. that he and his wife were not currently together. He also told J.M. that he should leave through the back door so that the neighbors would not see him. J.M. felt anxious and turned to open the door, but it was locked. He quickly unbolted the door and ran to his car. J.M. turned on Radio Now and heard about an incident that sounded similar to what he had just experienced. J.M. called the phone number broadcast by Radio Now and spoke to a police officer who happened to be at the radio station.

Around 6:30 that same morning, Brown called a McDonald's restaurant and spoke to M.C., a thirty-one-year-old cashier. Brown told M.C. that he was "Scott Ross" from Radio Now and invited M.C. to enter the "Summer dare to be wild contest" and win a Dodge Viper or any car up to $50,000, or elect a cash option of $50,000. *Id.* at 113. To win, M.C. had to go to 1731 Fletcher Avenue, "a randomly picked address," within the next forty-five minutes and persuade the occupant to give him a t-shirt in exchange for all his clothing. *Id.* at 131. Then, M.C. should wait by his phone for Radio Now to call and confirm that he had completed the dare. M.C. thought that Brown's voice was friendly and personable and believed him to be legitimate. He gave Brown his home and cell phone numbers. M.C.'s managers

gave him permission to leave work, and he did.

M.C. went home and changed out of his uniform into street clothes. He then drove to 1731 Fletcher Avenue and knocked on the door. After Brown answered the door, M.C. explained the contest and asked Brown to help him. Brown agreed. M.C. began to disrobe on the front porch, but Brown told him not to disrobe outside. M.C. walked into the entryway of the house. Brown brought M.C. a very small t-shirt, stood in the entryway, and watched M.C. undress. Brown suggested that M.C. cut the shirt in half and wear it like a skirt, and M.C. did so. Brown told him not to go out the front door and led him to the back of the house. M.C. left and drove home.

When the radio station failed to call, M.C. became suspicious. He turned on the radio to listen to Radio Now and heard the disc jockeys talking about an incident similar to his. He called the number broadcast by Radio Now and spoke to a police officer.

Police interviewed the three men. A.H. and M.C. were individually shown a photo array, and both identified Brown as the man at 1731 Fletcher Avenue. Radio Now did not have an employee named Scott Ross, nor did it have a dare contest in which contestants could win a car by trading their clothing for a t-shirt. At 7:29 p.m. that day, a search warrant was executed for 1731 Fletcher Avenue. Police found clothing belonging to A.H. and M.C. inside the home.

On July 29, 2004, the State charged Brown with three counts of class D felony criminal confinement (Counts I, III, and V) and three counts of class D felony identity deception (Counts II, IV, and VI). On March 30, 2005, a jury trial commenced. Throughout all trial proceedings, Brown wore civilian clothes and a yellow jail bracelet with a sheriff's star on his wrist. He wore the jail bracelet because he was incarcerated at the Marion County Jail and was required to wear it at all times. During trial, M.C. was asked to identify the person he had met at 1731 Fletcher Avenue. M.C. testified, "Uh, he's wearing a white shirt, a tie, a jail armband, black shoes with white socks and blue or black pants." *Id.* at 119.

Brown moved for mistrial, contending that M.C.'s testimony violated his right to be presumed innocent until proven guilty and violated a motion in limine that prohibited any reference to his criminal history. Brown argued that the witness's identification of the jail armband had the same effect as if the jury had seen him "in handcuffs and paraded around in leg irons." *Id.* at 121. In response, the State argued that (1) the motion in limine only prohibited reference to past crimes; (2) there was no doubt that Brown had been arrested for this crime; and (3) the statement was made inadvertently in response to the question of identification.

After conducting research, the trial court denied Brown's motion for mistrial. The trial court then asked Brown whether he wished to have a cautionary instruction. Brown declined the instruction, stating that he did not want to draw attention to the armband. However, he asked the trial court to keep the option of a cautionary instruction open in the event that it became apparent that the jurors heard the reference to the "jail armband" and it was "on their minds." *Id.* at 125. The court deputy informed the trial court that if Brown removed the yellow jail bracelet, he would be charged a fee. The State offered to pay for a replacement bracelet, but the trial court declined the offer. Brown then objected to having to wear the jail bracelet based upon the fact that it had been brought to the jury's attention and identi-

fied as jail clothing. The trial court overruled the objection. The jury found Brown guilty as charged.

On May 11, 2005, Brown filed (1) a motion to vacate his identity deception convictions based on double jeopardy principles, (2) a motion to vacate his criminal confinement convictions and identity deception convictions based on statutory vagueness and overbreadth, and (3) a motion to limit any sentence imposed on the identity deception counts to one year based on the proportionality clause of the Indiana Constitution. Notice was provided to the prosecutor and the attorney general.

At the sentencing hearing on May 31, 2005, the prosecutor and the attorney general responded to Brown's motions. The State argued that Brown waived his constitutional claims by failing to raise them in a motion to dismiss prior to trial. However, the trial court declined to find that Brown's constitutional claims were waived as untimely. The trial court granted the double jeopardy motion and denied the other two motions. The trial court merged the identity deception counts into the criminal confinement counts and entered judgment of conviction only on the latter. Appellant's App. at 12, 179. The trial court sentenced Brown to an aggregate eight-year sentence, with five years executed and three years suspended or on probation. In addition, over Brown's objection, the trial court imposed a $400 jury trial fee but waived it after finding that Brown was indigent. Brown now appeals.

### Discussion and Decision

#### I. Motion for Mistrial

Broadly stated, Brown asserts that the trial court erred in denying his motion for mistrial. He bases this claim of error on his assertion that he was compelled to wear the jail bracelet in violation of the Fourteenth Amendment. Before addressing these assertions, we note that Brown's first objection and motion for mistrial were premised on the *witness's statement* identifying the jail bracelet. Only after the trial court denied Brown's motion for mistrial and denied the State's offer to pay for replacing the jail bracelet did Brown object to *having to wear it* because the witness had identified it. Given these particulars, we think that Brown's two assertions, while interrelated, are actually two distinct claims and are more properly dealt with separately. First, we consider whether the trial court abused its discretion in denying Brown's motion for mistrial premised on the witness's statement identifying the jail bracelet. Then, we address Brown's claim that he was compelled to wear the bracelet in violation of the Fourteenth Amendment.

 In reviewing Brown's claim that the trial court erred in denying his motion for mistrial, we are governed by the following standard of review:

Whether to grant or deny a motion for mistrial is a decision left to the sound discretion of the trial court. We will reverse the trial court's ruling only upon an abuse of that discretion. We afford the trial court such deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. To prevail on appeal from the denial of a motion for mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. We determine the gravity of the peril based upon the probable persuasive effect of the misconduct on the jury's decision rather than upon the degree of impropriety of the conduct.

A mistrial is an extreme sanction warranted only when no other cure can be expected to rectify the situation. Reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings because a timely and accurate admonition to the jury is presumed to sufficiently protect a defendant's rights and remove any error created by the objectionable statement.

*Alvies v. State*, 795 N.E.2d 493, 506 (Ind. Ct.App.2003) (citations omitted), trans. denied.[2]

■ Specifically, Brown claims that the presumption of innocence and the Fourteenth Amendment to the United States Constitution were · violated after M.C. pointed out that Brown was wearing a jail identification bracelet. "The presumption of innocence, although not articulated in the constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Id.*

■ The State contends that Brown waived this claim by refusing the trial court's offer to give a cautionary jury instruction and that he fails to articulate how an admonishment would not have corrected the problem. We agree. "[A] timely and accurate admonition to the jury is presumed to sufficiently protect a defendant's rights and remove any error created by the objectionable statement." *Alvies*, 795 N.E.2d at 506. Here, after the witness identified the jail bracelet, defense counsel did not request an admonishment. Instead, he immediately moved for a mistrial. Further, when the trial court offered him the option of a cautionary instruction, he declined. Had defense counsel requested an admonishment, the trial court would have had the opportunity to admonish the jury and presumably cure any error. *See id.*

■ Waiver notwithstanding, Brown's claim must fail. We will not reverse the trial court's denial of a motion for mistrial

**2.** In a footnote, Brown asserts that Indiana's standard of review for a mistrial "cannot be squared" with that enunciated by the United States Supreme Court. Appellant's Br. at 26 n. 17. In support, he cites *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), for the principle that "[t]he Supreme Court required the State to demonstrate the harmlessness of an error beyond a reasonable doubt." *Id.* (citing *Estelle*, 425 U.S. at 512–13, 96 S.Ct. 1691). We note that the principle he asserts (which can be found at 425 U.S. at 506, 96 S.Ct. 1691) was not the holding of that case. In *Estelle*, the Supreme Court concluded that there was no constitutional violation, and therefore it did not need to address whether any reversible error was committed. However, in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1968), which Brown cites in passing, the Supreme Court *held* that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. 824. Inasmuch as Brown raised this issue in a footnote and did not provide a thorough analysis for our review, he has waived this issue. *See* Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on...."); *Davis v. State*, 835 N.E.2d 1102, 1113 (Ind.Ct.App.2005) ("A party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."), *trans. denied* (2006). Consequently, we do not address this issue. We note, however, that even if we applied the standard advocated by Brown, we would conclude that under these particular circumstances, any error that the trial court may have committed in denying Brown's motion for mistrial based upon the identification of the jail bracelet was harmless beyond a reasonable doubt.

unless the defendant demonstrates that "he was placed in a position of grave peril to which he should not have been subjected." *Alvies,* 795 N.E.2d at 506. Brown has not made that required demonstration here. The record reveals that defense counsel was not even sure if the jurors heard the witness's reference to the jail bracelet. Even if the jurors had heard the statement, the record is unclear as to whether the jury knew that Brown had to wear it because he was incarcerated. Further, defense counsel asked the trial court to keep the option of an admonishment open in the event that it became apparent that the jurors heard the reference to the "jail armband" and it was "on their minds." Tr. at 125. Defense counsel's decision not to exercise that option suggests that he did not believe that the reference to the jail bracelet had any significant influence on the jurors. Finally, the jail bracelet did not resemble handcuffs or shackles, and we therefore fail to see how its presence implied that Brown was dangerous. Accordingly, we conclude that the trial court did not abuse its discretion in denying Brown's request for a mistrial.

We now turn to Brown's claim that he was compelled to wear the jail bracelet in violation of the Fourteenth Amendment. "The State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." *French v. State,* 778 N.E.2d 816, 821 (Ind.2002) (citing *Estelle,* 425 U.S at 512, 96 S.Ct. 1691). However, "[t]he failure to object to being tried in prison clothes negates the compulsion necessary to establish a constitutional violation." *Id.* (citing *Estelle,* 425 U.S. at 512–13, 96 S.Ct. 1691). The State asserts that Brown did not object to wearing the jail bracelet until M.C. identified it at trial, and therefore Brown has waived this issue. We agree.

The United States Supreme Court's ruling in *Estelle,* 425 U.S. 501, 96 S.Ct. 1691, is relevant to this issue. In *Estelle,* the defendant appeared in clothing distinctly marked as prison issue. He made no objection to the trial court concerning his jail attire before trial. The Supreme Court held that, "[n]othing in this record ... warrants a conclusion that [defendant] was compelled to stand trial in jail garb or that there was sufficient reason to excuse the failure to raise the issue before trial." *Id.* at 512, 96 S.Ct. 1691.

Our supreme court followed *Estelle's* reasoning in *French,* 778 N.E.2d 816. There, the defendant appeared at his habitual offender proceeding in bright orange clothing with the word "jail" on the back. He failed to object to wearing the prison garb. Our supreme court held: "if a defendant objects, it is error to require the defendant to appear in jail garb at the habitual offender phase. Here, however, there was no objection and the issue is not preserved." *Id.* at 821.

Here, Brown failed to object to wearing the jail bracelet before trial. He did not object to the requirement that he wear the bracelet until a witness identified it as jail clothing. For all intents and purposes, Brown invited the error by failing to object in a timely manner.

Even if the trial court erred in overruling Brown's objection to wearing the jail bracelet because it had been identified, we think any error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1968) (holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). We reach this conclusion for the same reasons that we determined that the trial court did not abuse its discretion in denying Brown's

motion for mistrial: (1) defense counsel was not even sure that the jurors heard the reference to the jail bracelet; (2) even if the jurors heard the reference, the record is unclear as to whether the jurors knew why Brown was wearing it; (3) defense counsel chose not to request a cautionary instruction indicating that he did not think that the reference was significant; and (4) the jail bracelet does not resemble handcuffs or shackles.

## II. Waiver of Constitutional Issues

 The State contends that Brown waived his claims challenging the constitutionality of the criminal confinement and identity deception statutes by failing to raise them in a motion to dismiss prior to trial pursuant to Indiana Code Sections 35–34–1–4 and –6. Indiana Code Section 35–34–1–4 provides in pertinent part:

(a) The court may, upon motion of the defendant, dismiss the indictment or information upon any of the following grounds:

(1) The indictment or information, or any count thereof, is *defective under section 6* of this chapter.

. . . .

(b) Except as otherwise provided, a motion under this section shall be made no later than:

(1) twenty (20) days if the defendant is charged with a felony . . . prior to the omnibus date. *A motion made thereafter may be summarily denied if based upon a ground specified in subdivision (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5) of this section.* A motion to dismiss based upon a ground specified in subdivision (a)(6), (a)(7), (a)(8), (a)(9), (a)(10), or (a)(11) of this section may be made or renewed at any time before or during trial. A motion to dismiss based upon

lack of jurisdiction over the subject matter may be made at any time. (Emphases added.) Indiana Code Section 35–34–1–6 provides in relevant part that "[a]n indictment or information is defective when . . . the statute defining the offense is unconstitutional or otherwise invalid."

The State cites *Adams v. State,* 804 N.E.2d 1169 (Ind.Ct.App.2004), to support its argument that Brown waived his constitutional challenges. In *Adams,* a panel of this Court concluded that the defendant's constitutional claim was waived because the defendant failed to raise it in a motion to dismiss prior to trial. The *Adams* court relied on supreme court precedent in reaching this decision:

Generally, a challenge to the constitutionality of a criminal statute must be raised by a motion to dismiss prior to trial, and the failure to do so waives the issue on appeal. Ind.Code § 35–34–1–4; I.C. § 35–34–1–6; *Payne v. State,* 484 N.E.2d 16, 18 (Ind.1985); *Smith v. State,* 727 N.E.2d 763, 766 (Ind.Ct.App. 2000). Here, Adams failed to file a motion to dismiss, and he did not object to the constitutionality of the statute at trial. As a result, Adams may not challenge the constitutionality of the statute for the first time on appeal, and the issue is waived.

*Id.* at 1172.

Brown argues that he has not waived his constitutional challenges because (1) Indiana Code Section 35–34–1–4(b) permits a trial court to summarily deny an untimely motion, and the trial court declined to exercise that discretion; and (2) the constitutionality of a statute may be raised at any stage of the proceedings. In support of the latter, he cites *Vaughn v. State,* 782 N.E.2d 417 (Ind.Ct.App.2003), *trans. denied.* In *Vaughn,* the defendant was convicted of domestic battery and challenged the constitutionality of the do-

mestic battery statute for the first time on appeal. The State argued that the defendant waived his constitutional challenge by failing to file a motion to dismiss prior to trial. The *Vaughn* court chose to review the constitutionality of the domestic battery statute because the facts of the case revealed "just how far the words 'living as if a spouse' can arguably be stretched in order to convict an individual under the domestic battery statute." *Id.* at 419. In choosing to review the constitutional claim, the *Vaughn* court noted that "our Supreme Court has chosen on occasion to address the merits of the constitutional challenges to criminal statutes by acknowledging that while the argument would normally be waived, it may still be proper to address the argument." *Id.* Further, the *Vaughn* court quoted our supreme court for the principle that " 'the constitutionality of a statute may be raised at any stage of the proceeding including raising the issue *sua sponte* by this Court.' " *Id.* (quoting *Morse v. State,* 593 N.E.2d 194, 197 (Ind. 1992)).

In reviewing the parties' arguments, we first observe that this Court has applied the waiver doctrine and declined to review a constitutional challenge on its merits on many occasions. *See, e.g., Allen v. State,* 798 N.E.2d 490, 502 (Ind.Ct.App.2003); *Wiggins v. State,* 727 N.E.2d 1, 5 (Ind.Ct. App.2000), *trans. denied; Newton v. State,* 456 N.E.2d 736, 739 (Ind.Ct.App.1983); *Marchand v. State,* 435 N.E.2d 284, 287 (Ind.Ct.App.1982); *Salrin v. State,* 419 N.E.2d 1351, 1354 (Ind.Ct.App.1981). In other cases, both this Court and our supreme court have addressed the merits of a constitutional challenge after recognizing that the issue was waived. *See, e.g., Payne v. State,* 484 N.E.2d 16, 18 (Ind. 1985); *Rhinehardt v. State,* 477 N.E.2d 89, 93 (Ind.1985), *criticized on other grounds by Stout v. State,* 528 N.E.2d 476 (Ind. 1988); *Szpunar v. State,* 783 N.E.2d 1213,

1219 (Ind.Ct.App.2003); *Reed v. State,* 720 N.E.2d 431, 433 (Ind.Ct.App.1999), *trans. denied* (2000); *Vaillancourt v. State,* 695 N.E.2d 606, 610 (Ind.Ct.App.1998), *trans. denied.*

We think it proper to address Brown's claims on the merits. Unlike *Adams,* Brown raised his constitutional claim before sentencing and not for the first time on appeal. The trial court declined to find that Brown's claim was waived by its being untimely and considered the claim on its merits. The accused had a fair opportunity to present the issue, the prosecutor and attorney general both received notice and responded to the motion at the hearing, and we have an adequate foundation for addressing the issue. We also think that this case, like *Vaughn,* involves a unique set of facts, which demonstrates that certain terms used in the statute to define criminal confinement are subject to widely varying interpretation. Thus, this is a question of great public interest. Accordingly, we address the merits of Brown's claims challenging the constitutionality of the criminal confinement statute.

### III. Vagueness—Criminal Confinement Statute

█ Brown contends that the criminal confinement statute, Indiana Code Section 35–42–3–3, is unconstitutionally vague as applied to him, where he "merely lied about a radio contest that led individuals to leave their workplace to go to his home." Appellant's Br. at 12. The criminal confinement statute provides in relevant part:

(a) A person who knowingly or intentionally:

(1) confines another person without the other person's consent; or

(2) removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another;

commits criminal confinement ... a Class D felony.

Ind.Code § 35–42–3–3. Brown was charged with knowingly, by fraud and/or enticement, removing three men from their places of employment to his home.

Whether a statute is constitutional is a question of law that we review de novo. *State v. Moss–Dwyer*, 686 N.E.2d 109, 110 (Ind.1997).

When considering the constitutionality of a statute, we begin with the presumption of constitutional validity, and therefore the party challenging the statute labors under a heavy burden to show that the statute is unconstitutional. All reasonable doubts must be resolved in favor of the statute's constitutionality. A statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it adequately to inform them of the proscribed conduct. The statute need only inform the individual of the generally proscribed conduct and need not list with exactitude each item of prohibited conduct. A statute will only be found to be void for vagueness if it is vague as applied to the precise facts and circumstances of each case. Finally, a statute is not necessarily vague even if a party can demonstrate that the legislature could have provided more precise language.

*Szpunar*, 783 N.E.2d at 1219 (citations and quotation marks omitted). "[T]he void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Healthscript, Inc. v. State*, 770 N.E.2d 810, 815–16 (Ind.2002). "[T]here must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur." *State v. Downey*, 476 N.E.2d 121, 123 (Ind. 1985).[3]

The facts presented by the State to establish that Brown knowingly, by fraud and/or enticement, removed three men from one place to another are that (1) Brown called each man and told them that he was from 93.1 Radio Now, which was having a contest to win a car or cash, but Brown was not and had never been an agent, representative, or employee of Radio Now, and there was no such contest; and (2) each man left his place of employment and drove himself to Brown's house based on his statements.

**3.** In *McIntosh v. State*, 638 N.E.2d 1269 (Ind. Ct.App.1994), *trans. denied*, this Court rejected a vagueness challenge to the criminal confinement statute. Brown contends, the State does not dispute, and we agree, that *McIntosh* is inapposite. In that case, McIntosh was involved in a conflict with his former girlfriend and her current boyfriend at her residence. His former girlfriend, Ward, had taken her baby to her car, but the car would not start. McIntosh grabbed the baby from the car and stated, "I have your kid by his feet and I am going to drop him on his head." *Id.* at 1271. Ward ran to a neighbor's home to call the police. McIntosh and his wife drove to the neighbor's house, and McIntosh's wife handed the baby to Ward. McIntosh was charged with and convicted of knowingly or intentionally removing the baby by fraud, enticement, force or threat of force, from one place to another. On appeal, he argued that even if the jury had not believed his version of the facts, i.e., that he was merely returning Ward's abandoned child to her, the jury could not have convicted him under the statute. The *McIntosh* court rejected his argument, concluding that the statute was "sufficiently specific that no person of ordinary intelligence would be misled into thinking that a person returning an abandoned child to its parent was committing criminal confinement." *Id.* at 1276–77.

Specifically, Brown argues that the criminal confinement statute is unconstitutionally vague because the key words in the statute—fraud, enticement, and remove—are not defined by the statute, and thus the statute fails to provide adequate notice and does not establish minimal guidelines to govern law enforcement, prosecutors, and juries. Specifically, he argues that the statute does not provide notice to persons of ordinary intelligence that devising a fake radio contest, in which persons drive themselves to someone's house and no force is used to make them enter the home or prevent their exit, constitutes criminal confinement.

In support of his argument, Brown directs our attention to the definitions of the terms—fraud, enticement, and remove—provided by a dictionary an ordinary person would use. Fraud is "(1) A deception deliberately practiced in order to secure unfair or unlawful gain. (2) A piece of trickery; a trick. (3)(a) One that defrauds; a cheat. (b) One who assumes a false pose; an impostor." Dictionary.com, *http://dictionary.reference.com/search?q=fraud* (last visited May 1, 2006). To entice means "[t]o attract by arousing hope or desire; lure: *The promise of higher pay enticed me into the new job.*" Dictionary.com, *http://dictionary.reference.com/search?q=entice* (last visited May 1, 2006). Remove means "[t]o move from a place or position occupied: removed the cups from the table." Dictionary.com, *http://dictionary.reference.com/search?q=remove* (last visited May 1, 2006).

The State argues that the statute's definition of criminal confinement distinguishes between conduct that is trivial, such as a lie or promise, from conduct that is substantial, such as fraud or enticement,

and that Brown did not commit a trivial lie. In support of its argument, the State relies upon Black's Law Dictionary. Fraud is defined as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." BLACK'S LAW DICTIONARY 685 (8th ed.2004). A lie is merely "[t]o tell an untruth." *Id.* at 940. Enticement is "[t]he act or an instance of wrongfully soliciting or luring a person to do something." *Id.* at 573. A promise is "a person's assurance that the person will or will not do something." *Id.* at 1249.

We agree with Brown that the ordinary understanding of the terms fraud and enticement is so broad that there is no discernible standard between lawful and unlawful conduct.[4] The same is true with respect to the definitions in Black's Law Dictionary. In Black's definition of fraud, the words "to act to his or her detriment" could have significantly different meanings to different people. Likewise, the word "wrongfully," used in Black's definition of enticement, is subject to a multitude of interpretations. By way of illustration, we note that many activities frequently engaged in by members of society would constitute criminal confinement pursuant to these terms. For example, asking a person to attend a quiet dinner that is actually a surprise birthday party could constitute removal of a person by fraud or enticement because some people do not enjoy surprise parties and might therefore think the lie told to lure them to the party was wrongful. Also, a person participating in a dating service who misrepresents themselves and successfully persuades another person to meet him or her could be subject to a criminal confinement conviction. The person who was misled by the

---

4. We think the term "remove" is sufficiently understood by persons of ordinary intelligence so as not to impair the constitutionality of the criminal confinement statute.

misrepresentation might think that he or she had acted to his or her detriment.

During oral argument, the State asserted that an evil motive is inherently an element of a crime, citing *Kinney v. State,* 404 N.E.2d 49 (Ind.Ct.App.1980). First, we fail to discern how the insertion of "evil motive" into the criminal confinement statute would provide sufficient definiteness of the proscribed conduct. "Evil motive" is an ambiguous term, and its meaning would vary from person to person. Thus, even if an "evil motive" were required, we do not think that individuals of ordinary intelligence would be adequately informed that conduct such as Brown's is prohibited by the statute. Further, requiring an "evil motive" would not prevent arbitrary enforcement by police, prosecutors, and juries because its interpretation is so variable.

Second, the State's assertion is a misstatement of *Kinney's* holding. In *Kinney,* the defendant claimed that the harassment statute, Indiana Code Section 35–45–2–2 (Burns 1979 Repl.), was unconstitutionally vague. In relevant part, the harassment statute read as follows: "Harassment. (a) A person who, with intent to harass, annoy, or alarm another person but with no intent of legitimate communication (1) Makes a telephone call, whether or not a conversation ensues[.]" *Id.* at 51. In rejecting the defendant's constitutional challenge, we concluded that the specific intent required by the language of the statute, "to harass, annoy, or alarm another person but with no intent of legitimate communication," prevented the statute from being unconstitutionally vague. In reaching this conclusion, we stated:

> " . . . The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may

otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning. . . . But where the punishment imposed is only for an act knowingly done *with the purpose of doing that which the statute prohibits,* the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law."

*Id.* (quoting *Screws v. United States,* 325 U.S. 91, 101–102, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (emphasis added). In other words, specific intent was expressly included as an element of the harassment statute, and therefore the statute provided adequate notice of the prohibited conduct.

Here, we note, the criminal confinement statute does not expressly require a specific intent as an element of the crime. Even under Black's definition of fraud and enticement, a specific intent is not included. The best that can be said is that fraud may imply a bad motive, but enticement is completely devoid of such a factor.

We also think that *Vaughn,* 782 N.E.2d 417, is helpful in determining whether the criminal confinement statute is unconstitutionally vague. The *Vaughn* court held that the domestic battery statute was unconstitutionally vague because "living as if a spouse" may be based on many things, and therefore different people could interpret the language differently. *Id.* at 419. Here, as in *Vaughn,* different people may interpret the undefined terms in the criminal confinement statute—fraud and enticement—differently. We conclude that the criminal confinement statute does not provide notice to persons of ordinary intelligence that devising a fake radio contest, in which persons drive themselves to some-

one's house and no force is used to make them enter the home or prevent their exit, constitutes criminal confinement and that the terms are not defined in a manner to avoid arbitrary and discriminatory enforcement.[5] Therefore, the criminal confinement statute is unconstitutionally vague as applied to Brown. We reverse Brown's criminal confinement convictions.[6]

### IV. Vagueness—Identity Deception Statute

Brown contends that the identity deception statute, Indiana Code Section 35–43–5–3.5, is unconstitutionally vague as applied to him where he merely lied about working for or being a fictitious person at 93.1 Radio Now. Brown was charged with three counts of identity deception as follows:

> Richard Carlos Brown, on or about July 29, 2004, did knowingly use the identifying information of another person, namely: Radio Now (93.1), without the other person's consent and with the intent to harm or defraud another person, that is [J.M., M.C., A.H.], and/or profess to be another person, that is: an agent of Radio Now (93.1).

Appellant's App. at 22–24. The identity deception statute provides in pertinent part:

> (a) Except as provided in subsection (b), a person who knowingly or intentionally obtains, possesses, transfers, or uses the identifying information of another person:
>
> (1) without the other person's consent; and

(2) with intent to:

(A) harm or defraud another person;

. . . or

(C) profess to be another person;

commits identity deception, a Class D felony.

. . . .

(c) It is not a defense in a prosecution under subsection (a) that no person was harmed or defrauded.

Ind.Code § 35–43–5–3.5 (emphases added). At the time of Brown's offenses, "identifying information" was defined as "information that identifies an individual, including an individual's: (1) name, address, date of birth, place of employment, employer identification number, mother's maiden name, Social Security number, or any identification number issued by a governmental entity[.]" Ind.Code § 35–43–5–1(h) (now 35–43–5–1(i)) (Emphasis added). We observe that the term "including" indicates that the list of identifying information provided by the statute is not exclusive. "Person," means "a human being, corporation, limited liability company, partnership, unincorporated association, or governmental entity." Ind.Code § 35–41–1–22.

Brown asserts that persons of ordinary intelligence would not be on notice that pretending to be a radio disc jockey constitutes identity deception and that upholding the constitutionality of the statute as applied to the facts of this case creates an enormous potential for erratic and arbitrary enforcement. Specifically, he claims that he was not aware of, nor did he use, any "identifying information" as defined by

---

**5.** While J.M. testified that the door was locked when he initially tried to leave, the State did not allege, nor was any evidence presented to establish, that Brown attempted to prevent J.M. from unlocking the door and leaving. The record is also unclear as to whether the door locked automatically.

**6.** Consequently, we need not address Brown's claims that the criminal confinement statute is unconstitutionally overbroad, that there was insufficient evidence to support his conviction for criminal confinement, or whether the sentence is inappropriate in light of the nature of the offenses and his character.

Indiana Code Section 35–43–5–1(h). The State argues that there is no ambiguity or risk of arbitrary enforcement in the identity deception statute as applied to Brown and that he knew and used the unique identifying information of a corporation and, in so doing, committed identity deception. We agree with the State.

"Person" includes a corporation. I.C. § 35–41–1–22. "Radio Now" and "93.1" constitute information that identifies an existing Indianapolis corporation. Brown knowingly used the name and call number of the radio station without its consent to harm or defraud three men by luring them to his home to undress in front of him as part of a fictitious radio contest.

Brown asserts that ordinary people associate identity deception with the misuse of credit data. Even if that is true, it does not necessarily lead to the conclusion that the identity deception statute applies only to the misuse of credit data and that ordinary people understand it to be so limited. Brown also contends that the statute is so ambiguous that persons dressing up as someone else on Halloween or providing a false name at a bar are committing identity deception. We think that the statute is written in a manner that excludes such conduct in that it requires the "intent to harm or defraud another person." I.C. § 35–43–5–3.5; *see Kinney,* 404 N.E.2d at 51. Further, contrary to Brown's assertion, his conduct is not comparable to that of a person dressing up in a Halloween costume. He was not merely pretending to be a disc jockey for fun, he was purporting to be an agent of an actual radio station by using its identifying information without its consent in order to lure men to his house to undress in front of him. We

conclude that the identity deception statute is defined with sufficient definiteness to adequately inform persons of ordinary intelligence that knowingly using the identifying information of a corporation, such as a radio station, without its consent and with intent to harm or defraud another person constitutes identity deception. We further conclude that it provides satisfactory guidelines to police, prosecutors, and juries to avoid arbitrary and discriminatory enforcement. Accordingly, the identity deception statute is not unconstitutionally vague as applied to Brown.

### V. Sufficiency of the Evidence— Identity Deception Verdict

Brown contends that there is insufficient evidence to support the jury's verdict that he is guilty of three counts of identity deception.[7]

Our standard of review for sufficiency claims is well settled. We do not re-weigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt.

*O'Connell v. State,* 742 N.E.2d 943, 949 (Ind.2001) (citation omitted). To convict Brown as charged, the State had to prove beyond a reasonable doubt that he knowingly used the identifying information of another person without the other person's consent and with the intent to (1) harm or defraud another person and/or (2) profess to be another person.

---

**7.** While both Brown and the State refer to Brown's identity deception "convictions," the trial court merged the identity deception counts with the criminal confinement counts and did not enter judgment of conviction on the identity deception verdicts. Appellant's App. at 12, 179.

The State presented evidence that Brown called each man and claimed to be from "the 93.1 radio station" or "Radio Now." Brown contends that by simply claiming to be an agent of Radio Now (93.1), he did not use "the identifying information" of another "person," as that term is used in the identity deception statute, and therefore the State failed to prove either of these elements beyond a reasonable doubt. In particular, he contends that "person" as used in the identity deception statute refers only to a human being and that he never claimed to be another actual human being.

Brown concedes that Indiana Code Section 35–41–1–22 broadly defines "person" as a human being, corporation, limited liability company, partnership, unincorporated association, or governmental entity. Appellant's Br. at 36. However, he asserts that "person" must be considered in conjunction with the definition of "identifying information." He correctly notes that the definition of "identifying information" uses the word "individual" three times and never makes reference to the word "person." He asserts that an "individual" in the context of social security and credit card numbers equates only to a real person—not a made-up name or a real radio station. Therefore, according to Brown, "person" as it is used in the identity deception statute must be limited to a human being. We disagree.

While the identity deception statute and the identifying information statute in effect at the time Brown committed the crimes contain an unfortunate mixture of the terms "person" and "individual," we do not agree with Brown's conclusion that only a human being may be the victim of identity deception. "Person" is used in the identity deception statute multiple times in reference to the victim: "obtains, possesses, transfers, or uses the identifying information of another *person* without the other *person's* consent ... to profess to be another *person* ... It is not a defense ... that no *person* was harmed or defrauded." "Person" is unambiguously defined to include a corporation under Title 35 of the Indiana Code, which governs criminal law. I.C. § 35–41–1–22.[8] Brown's narrow interpretation of the statute would render its language meaningless in that its multiple references to "person" would be mere surplusage. As a practical matter, corporations require identity protection for the same reasons that human beings do, to safeguard their privacy, financial security, goodwill, reputation, etc. We see no evidence that the legislature excluded corporations, or any of the other entities included within the definition of "person" in Indiana Code Section 35–41–1–22, from victimization under the identity deception statute.

We now address Brown's contention that there was insufficient evidence that he used "identifying information." As we previously observed, the list provided by Indiana Code Section 35–43–5–1(h) is not exclusive. Radio Now is the station's name and 93.1 is the station's call number.

---

8. In fact, "person" is repeatedly defined throughout the Indiana Code to include corporations. *See* Ind.Code § 22–2–2–3 (minimum wage law); Ind.Code § 16–18–2–274(a) (health provisions); Ind.Code § 4–2–6–1(11) (ethics and conflicts of interest for state officers); Ind.Code § 5–14–1.5–2(k) (public records and meetings); Ind.Code § 5–16–8–1 (steel procurement for public works); Ind. Code § 8–1–22.5–1(e) (utilities: gas pipeline safety); Ind.Code § 8–21–3–1(12) (aeronautics: aircraft finance); Ind.Code § 9–13–2–124 (motor vehicles); Ind.Code § 13–29–1–2(p) (environment: low-level radioactive waste); Ind.Code § 14–8–2–202(d) (natural resources department); Ind.Code § 22–9–1–3 (labor and industrial safety: civil rights); Ind. Code § 22–12–1–18 (labor and industrial safety: fire safety and building equipment).

We think that the name and call number of a radio station are its "identifying information." We conclude that there was sufficient evidence to support the jury's verdict that Brown is guilty of three counts of identity deception. We therefore remand so that the trial court may enter judgment of conviction thereon and resentence Brown as appropriate.[9]

### VI. Imposition of Jury Fee

■ Brown contends that the $400 jury fee violates both the Indiana Code and the Due Process Clause of the state and federal constitutions. In Indiana, criminal defendants are guaranteed the right to a trial by jury through Article 1, Section 13 of the Indiana Constitution and the Sixth Amendment to the United States Constitution. *Gooch v. State*, 685 N.E.2d 152, 155 (Ind.Ct.App.1997).

Brown correctly notes that we have held that without statutory authority, the trial court has no power to assess jury costs. *See id.* at 155; *Cranor v. State*, 699 N.E.2d 284, 287 (Ind.Ct.App.1998). However, the legislature has now authorized such an assessment. Indiana Code Section 33–37–5–19(a) provides, "The clerk shall collect a jury fee of two dollars ($2) in each action in which a defendant is found to have committed a crime, violated a statute defining an infraction, or violated an ordinance of a municipal corporation." The State concedes that the trial court's assessment of a $400 jury fee exceeded its statutory authority. We therefore affirm the imposition of the jury fee but remand for entry of a two-dollar jury fee. Upon remand, the trial court may reconsider whether to waive the fee based on a determination of Brown's indigency.

### Conclusion

In summary, the trial court did not abuse its discretion in denying Brown's motion for mistrial. The criminal confinement statute is unconstitutionally vague as applied to Brown, and we therefore reverse those convictions. The identity deception statute is not unconstitutionally vague as applied to Brown. There was sufficient evidence to support Brown's guilty verdicts for three counts of identity deception. We remand for judgment of conviction to be entered for the identity deception guilty verdicts and for resentencing. Finally, the trial court had statutory authority to impose jury costs, but the $400 fee exceeded its statutory authority of two dollars. Consequently, we remand for entry of a two-dollar jury fee.

Affirmed in part, reversed in part, and remanded.

FRIEDLANDER, J., and MAY, J., concur.

---

**9.** Accordingly, we need not address Brown's claim that the sentence for identity deception is unconstitutionally disproportionate as compared to the sentence for impersonation of a public servant.